No. 13,516.

STRAHORN-HUTTON-EVANS COMMISSION COMPANY VS. RED RIVER OIL
COMPANY, LIMITED.

SYLLABUS.

1. Under a contract by a party to furnish another with hulls and cotton seed
   meal for feeding cattle, wherein the quality of the articles to be furnished
   is not declared, the vendor's obligation in respect thereto is governed by the
   provisions of Article 2156 of the Civil Code to the effect that "if the debt is
   of a thing which is determined only by its species, the debtor, in order to
   gain his discharge, is not bound to deliver it of the best kind, but he cannot
   tender it of the worst."

2. Complaints made on special occasions of the feed furnished on these dates,
   which objections were removed by the substitution immediately of other
   feed, did not rise to the seriousness of a putting in default. The fact that
   on all other occasions the feed furnished was not only received and used
   without objection, but paid for according to the terms of the contract
   without complaint, is evidence that there was no just cause for dissatisfac-
   tion. (Giecke vs. Finlay & Brunswig, 45th Ann. 408.)

3. The mere fact that a party who has contracted to furnish another with feed
   for his cattle, knows that the latter intends to ship them to market for sale
   when fattened, does not commit him to the fattening of the cattle by the
   feed, particularly when it is not pretended that the vendor was an expert
   in cattle feeding, or had any knowledge as to what particular quality of
   feed would bring about certain results, or had made any representations or
   stipulations on that subject. When it is shown that a number of contribut-
   ing causes led up to the cattle's not fattening as the purchaser had con-
   templated, the vendor of the feed would not be liable for loss to the pur-
   chaser, if the badness of the food had been one of such causes and the
   vendor was legally liable unless it could be shown what proportion of the
   loss was attributable to that fact.

A PPEAL from the Tenth Judicial District, Parish of Rapides—
     *Hunter J.*

*Robert P. Hunter* and *Munholland & Munholland* for Plaintiff, Ap-
pellant.

*M. C. Mosely* for Defendant, Appellee.

The opinion of the court was delivered by NICHOLLS, C. J.

STATEMENT OF THE CASE.

NICHOLLS, C. J. The plaintiff seeks to obtain a judgment against the defendant for the sum of twenty-four thousand three hundred and sixty dollars, with legal interest.

Its demand is based upon allegations that, on the 9th of June, 1898, the defendant company made a written contract with Charles E. Greneaux, obligating themselves to furnish cotton seed hulls and meal of prime quality, sufficient to feed from fifteen hundred to two thousand head of beef cattle during the fall and winter of 1898 and 1899, at or near their mill in the Parish of Rapides, in order to fatten said cattle for the markets of St. Louis or Kansas City, to which the cattle, when fattened, were to be shipped for sale, and at certain prices as stipulated in the said written contract.

That, acting on the faith of said written contract, they furnished to said Greneaux about fifty-four thousand ($54,000) dollars in ready cash, with which to purchase and with which he did purchase and ship to Alexandria, Louisiana, eighteen hundred head of beef cattle to be fed with first-class cotton seed hulls and meal to be furnished by the said Red River Oil Company, Limited, for the purpose of fattening them for sale in the spring in the western beef markets, to the knowledge of the defendant company.

That, on or about the 10th day of January, 1899, they purchased from the said Greneaux the said eighteen hundred head of beef cattle, being eight hundred and forty-three head of three-year old steers, and nine hundred and fifty-seven four-year old and up steers; and with the full knowledge and consent of the said Red River Oil Company, Limited, they were substituted in the said contract for and instead of the said Greneaux, and were subrogated specially in and to all his rights and actions into and growing out of the said contract of June 9th, 1898.

That it was well known to and understood by the Red River Oil Company that the said eighteen hundred head of beef cattle were to be fed for shipment, after they had been fattened, to St. Louis or some other of the western cattle markets, and that the defendants were also fully aware that the said cattle could not be fattened profitably unless they were fed with the very best quality of cotton seed hulls and cotton seed meal, and notwithstanding this fact the hulls and meal furnished by it to the said Greneaux and to themselves, after they bought the cattle and assumed his contract, were of an inferior kind and quality and by no means first-class as they should have been, and that by reason of said

inferior quality and bad condition of said hulls and meal, the said cattle failed to fatten as they would have done if they had been properly fed, and never did reach the weight which they˜would have reached if the seed and hulls furnished by the said defendant company had been of the first grade in kind and quality, by reason of which fault, want of care, negligence and active violation of their said written contract by the defendant, plaintiff· suffered great loss, damage and injury, as follows, viz:

| | | |
|---|---:|---:|
| Loss by steers not weighing one thousand and fifty pounds, standard weight | $3060 | 88 |
| Loss of price on steers sold by reason of not being in prime condition | 2260 | 89 |
| Loss on ten sick which died in pen at Alexandria | 424 | 35 |
| Loss on 19 sold at Alexandria | 616 | 26 |
| Loss three drunken steers abandoned at Pine Bluff, Arkansas | 127 | 29 |
| Loss on 1027 head sold to Kennedy | 13,562 | 79 |
| That they are entitled to deduction on the feed bill of C. E. Greneaux by reason of the inferior quality of meal and hulls furnished in the sum of | 1301 | 85 |
| And on feed bill furnished to plaintiff | 3005 | 70 |

In all aggregating the sum of.........................$24,360 01

Twenty-four thousand three hundred and sixty and one hundredths dollars.

That the defendant well knew that Greneaux and themselves were entitled to prime quality of cotton seed hulls and meal, and ·that only that quality of meal and hulls would give satisfactory and profitable results in the feeding of the cattle, and that the defendant company also knew that the hulls and meal furnished by them were of an inferior quality, and were not suitable for feeding cattle, and would produce disease when fed to the cattle, and notwithstanding the numerous protests made to them from time to time by C. E. Greneaux and plaintiff as to the inferior quality of the hulls and meal furnished by it, and notwithstanding that they could easily and readily have procured a prime quality of hulls and meal in sufficient quantities to have complied with their contract, they continued to furnish the inferior quality of hulls and meal, and failed to procure prime quality elsewhere, as they could have done and were obliged to do, thereby causing the loss and injury. to plaintiffs above alleged.

Judgment was asked to conform to these averments.

Defendant answered, first pleading the general issue. It averred that if plaintiff ever sustained damage it was caused, or at least contributed to, by the plaintiff's own negligence, mismanagement and misconduct, in either of which events there could be no recovery.

That plaintiff's petition failed to allege no want of contributory negligence, which was a necessary averment, and the absence of which furnished ground for the dismissal of plaintiff's suit; that this allegation could not, however, be truthfully made, for the plaintiff and its agents well knew that in truth and reality, they were guilty of contributory negligence and that the real and true cause of not making more on the cattle, was due to bad weather, bad handling, mismanagement and negligence on their part, as would be fully shown on the trial.

That the plaintiff and its representatives well knew what kind of feed they were buying and getting, knowingly accepted it and voluntarily appropriated it to their own use; that they had the control and management of their cattle, and themselves selected and fed the feed to the cattle; and paid for same up to near the end of the feeding season, and for the balance of eight hundred and seventy-one 60-100 dollars, then due to defendant, the agent and managing representative of the plaintiff, recognizing and admitting same to be. due, gave a draft on his principal, the said Strahorn-Hutton-Evans Commission Company of St. Louis, Mo., thus leading the defendant and its representatives to believe that they were going to get the balance due for feed, until the cattle had been taken away, and carried beyond the reach of defendant or the process of the court, thus by bad faith and deceitful practices misleading defendant's representatives and depriving defendants of their lien and privilege upon the cattle to secure the money for the feed they had been eating, and depriving them of the opportunity to attach the cattle as property of absentees. That this draft when subsequently forwarded by defendant for payment was not paid, and went to protest for non-payment, necessitating the expense of protest, all of which would be more fully shown on the trial hereof.

That after having given credit to plaintiff for sacks returned and a wagon, as claimed by plaintiff, the plaintiff still owed defendant the full sum of seven hundred and ninety-two and 31-100 dollars, for feed furnished, for which sum ($792.31) defendant reconvened and asked judgment.

That the plaintiff had caused serious injury to defendant; that they

unnecessarily called away defendant's general manager to Natchitoches, by telegram, not only putting him to inconvenience, trouble and annoyance, but also depriving defendant of his care, attention, skill and services in having its mill properly and safely operated, and thus causing the breaking of costly machinery, oil press cylinders, and thus forcing defendant to pay five hundred and ninety-five dollars to repair the broken machinery; and also producing a reduction of the capacity of the mill for at least three weeks, thus causing defendant a further loss of nine hundred dollars, and also at other times unnecessarily requiring and occupying attention and time of the general manager of the mill, when it should have been devoted to the business of the mill to his great annoyance, inconvenience and vexation and to the loss and injury of defendant in the sum of two thousand dollars; aggregating the sum of three thousand four hundred and ninety-five dollars.

That it had been further injured by the slander and defamations of the plaintiff seriously affecting its credit and the public confidence which it had always enjoyed, and depriving defendant of profitable patronage, and seriously damaging its business, by accusing defendant of breaking its contract and violating its obligations and by trying to impress the public with the idea that its products will kill or injure cattle, and besmearing its fair name and high standing for fair dealing, a matter of the highest importance to defendant, in obtaining loans from banks, which it is compelled to do during the cotton seed season, and also in the midst of strong competition with powerful rivals, in obtaining seed from planters and disposing of the products of its mill. For thus slandering and injuring defendant, the plaintiff owed it compensation in damages in the sum of twenty-five thousand dollars, which together with the other damages above set forth aggregates the sum of twenty-eight thousand four hundred and ninety-five dollars damages, in addition to the unpaid feed bill above set forth of seven hundred and ninety-two and 31-100 dollars, and for all of which defendant reconvened and asked for judgment.

Defendant prayed that the demands of the plaintiff be rejected, and that there be judgment, by way of reconvention, in its favor and against the plaintiff, for the sum of seven hundred and ninety-two and 31-100 dollars, together with legal five per cent. per annum interest thereon from the date of said draft, the 1st day of April, 1899, and for the additional sum of twenty-eight thousand four hundred and ninety-five dollars damages, together with legal interest thereon from judicial demand.

Plaintiff filed a plea of estoppel against the defendant, alleging that defendant had induced it to enter into the contract under date of January 11th, 1899, between C. E. Greneaux, Red River Oil Mill, Limited, and plaintiff, under the stipulation, agreement and mutual understanding by and between all the parties that:

1st.    Strahorn-Hutton-Evans Commission Company should be and was made the transferrees of C. E. Greneaux, in the feed contract of date June 9th, 1898, between Red River Oil Mill, Limited, and C. E. Greneaux, with the knowledge and consent of Red River Oil Mill, Limited, and as a condition, precedent, insisted upon and did actually receive from plaintiff the sum of three thousand nine hundred and twenty-six 66-100 dollars due Red River Oil Mill, Limited, by C. E. Greneaux, on said feed contract, for which amount plaintiff was in no manner liable, and which caused plaintiff to alter and change its position to its prejudice as is fully shown and set out in said contract bearing date of January 11th, 1899.

2nd.    Shows that from completion of said contract to April 1, 1899, plaintiff received from defendant, cotton seed meal and hulls, as subrogee to the Greneaux contract of June 9, 1898, paying defendant therefor under protest against the quality of said meal and hulls, defendant receiving the price agreed upon in said contract of June, 1898.

3rd.    That in defendant's reconventional demand, set up in answer to this suit, defendant is judicially claiming and asserting that under said contract there is due an alleged balance of seven hundred and ninety-two 31-100 dollars, arrived at, determined and fixed under the terms and conditions of the Greneaux contract of June 9, 1898, and is still praying for judgment for said amount.

Plaintiff, therefore, shows that for the first and second reasons and causes herein stated, the defendant is estopped by its said act *en pais,* and by the third cause and reason defendant is judicially estopped from claiming, contending or asserting or denying that plaintiff was and is not the transferree and subrogee of and fully subrogated to all the rights and privileges of said C. E. Greneaux, to the feed contract under date of June 9, 1898, marked "Defendant A," and further that the defendant is judicially estopped from contending, asserting or claiming that the said Greneaux contract, under date of June 9, 1898, had been abrogated or eliminated, either by contract of January 11, 1899, or by any subsequent parol agreement between the parties to the said contracts.

Plaintiff, therefore, prays that this plea of estoppel *en pais,* and plea

of judicial estoppel be allowed and filed and sustained, and the demand of defendant rejected at its cost in relation thereto.

The issues were tried by a jury, who returned a verdict rejecting plaintiff's demands and allowing defendant's claim for feed bill as claimed, and disallowing the reconventional demand for other damages.

Judgment was rendered in conformity to the verdict, and plaintiff appealed.

Defendant, in the Supreme Court, asked damages as for a frivolous appeal, and contingently prayed for an increase of judgment in its favor.

### OPINION.

The plaintiff company sues the defendant for twenty-four thousand three hundred and sixty dollars damages, claiming that with the full knowledge and consent of the Red River Oil Company, Limited, it had been substituted, in lieu of Charles E. Greneaux, in a certain written contract, entered into by the latter on or about the 10th of June, 1898, with the Red River Oil Company, Limited, and specially subrogated in and to all his rights and actions to and growing out of said contract. The contract referred to was a written proposition accepted by Greneaux in which the Oil Company declared that "it had agreed to furnish Greneaux hulls and meal to feed from 1500 to 2000 head of cattle, on the basis of 33 and 1-3 per cent. of cost of the seed; that is (if) average cost of the seed at the mill is seven 50-100 dollars per ton, price of hulls shall be two 50-100 dollars per ton at the mill. If price of seed declines to average cost of six dollars delivered at the mill (for) the season price of hulls shall be two dollars per ton at mill.

"If price of seed averages nine dollars per ton, price of hulls shall be three dollars per ton at mill. Price of meal shall be—basis $15.00 per ton at average cost of seven 50-100 dollars per ton for seed, and this price shall be declined or advanced one-half of what seed may decline or advance as the case may be.

"Settlement shall be made during the season at two 50-100 dollars for hulls, and $15.00 for meal, and at end of season when average cost of seed delivered at the mill is ascertained, the adjustments shall be made by deducting or adding to above prices as the case may be, as herein stated. These conditions are to be left over to Greneaux until the 2nd of August next, at which time he is to notify us whether he is to take the feed, and feed the cattle. Mr. Greneaux agrees to take feed on these conditions and prices for fifteen hundred to two thousand head of

cattle, and not to feed cattle at any other place (Natchitoches excepted) until he has placed in feed pens, with us, the fifteen hundred or two thousand head."

Referring to this contract plaintiff, in its petition, averred that defendants had obligated themselves to furnish cotton seed hulls and meal of prime quality, and first-class as to quality, sufficient to feed from fifteen hundred to two thousand head of beef cattle, during the fall and winter of 1898 and 1899 at or near their mill in the Parish of Rapides, in order to fatten said cattle for the markets of St. Louis or Kansas City, to which the cattle, when fattened, were to be shipped for sale.

The contract in question was made by Greneaux, in view of a contemplated purchase of cattle which he proposed to take to the Parish of Rapides for feeding.

Greneaux did, in fact, make a purchase of cattle in Texas, of which some were shipped by rail and left at Natchitoches, while eighteen hundred were left in Alexandria, in Rapides Parish, in November, 1898.

The plaintiff company advanced Greneaux fifty-one thousand four hundred and eighty-eight dollars with which to make this purchase, and in representation of the loan Greneaux executed and delivered, on November 22, 1898, his eight promissory notes for different amounts, payable at different dates, with eight per cent interest thereon from maturity; the first of these notes matured on March 5, 1899; the last on April 28, 1899.

The yellow fever prevailed in Louisiana in 1898, and in consequence of the quarantine which had been established because of it, Greneaux did not accompany the cattle to Alexandria, but the landing and care of the same was entrusted to his employees.

The fall season of 1898 and the early winter of 1899 were exceedingly bad in Louisiana, affecting very injuriously the cotton crop and cotton seed, and cattle exposed to the weather. Greneaux became satisfied that his venture would prove an unprofitable one, and in view of that fact and of his physical condition at that time, he proposed to the plaintiff company to sell to it all the cattle at Alexandria for and in consideration of a surrender by it of his notes. The plaintiff accepted the proposition and accordingly, on the 10th of January, 1899, a written act of sale of the eighteen hundred cattle at Alexandria was made from Greneaux to it for said price, the price being paid by the surrender of the notes referred to.

It appears that before this (to-wit on the 5th of November, 1898,) Greneaux had, by act before Randsell, clerk of Rapides Parish, secured payment of these notes in favor of the plaintiff by a pledge upon the eighteen hundred head of cattle then in Rapides.

In the act of sale of the cattle, of the 10th of January, 1899, this pledge is referred to and it was stated that that sale was to take the place of the act of pledge. It was also stated in the act of sale that Greneaux had that day given his order on the Red River Oil Company for the amount of fifteen hundred dollars worth of meal and hulls to be delivered to the plaintiff as per his contract with the Oil Company.

It appears that it was contemplated that the Oil Company should be secured for the seed it was to furnish, by pledge upon their cattle in Rapides, but this pledge was never, in fact, made out. On the 11th of November, 1898, the Oil Company wrote to the plaintiff that Greneaux had made satisfactory arrangements with it for the payment of feed for eighteen hundred head of cattle, and that their bill for feed was waived until the full and final payment to the plaintiff of twenty-seven dollars per head on the said steers. On the 5th of December, 1898, Greneaux, by act before notary, Charles V. Porter, notary for the Parish of Natchitoches, acknowledging that he was indebted to the Oil Company in the sum of twelve thousand dollars, evidenced in his note for that amount, and interest, secured the payment of said note in favor of the Oil Company by pledge upon seven hundred head of beef cattle then in Natchitoches.

This note was evidently for the supposed sum which the feed contract would call for. On the 11th of January, 1899, an act was passed between Greneaux, the Strahorn-Hutton-Evans Commission Company and the Red River Oil Company, Limited, in which the Oil Company for and in consideration of the sum of thirty-nine hundred and twenty-six dollars and sixty-six cents transferred, without recourse, to the plaintiff company its right, title and interest in and to the contract of pledge made in its favor, before Porter, notary, of the seven hundred beeves referred to in that contract, to secure the payment of Greneaux's twelve thousand dollars' promissory note. It was declared that the amount of this note was, by consent of Greneaux, the Oil Company, and the Strahorn-Hutton-Evans Commission Company, reduced to the sum of five thousand four hundred and twenty-six 66-100 dollars. The note of twelve thousand was accordingly credited with the sum of six thousand five hundred and seventy-three 34-100 dollars, as was the pledge. The note so reduced was transferred to the present plaintiff

company "together with all the rights, privileges and actions growing out of said contract of pledge;" the Oil Company substituting the plaintiff company in its stead in said contract of pledge as holder of the note.

The Red River Oil Company in said act "moreover bound and obligated itself to feed the fifteen hundred head of cattle then at Alexandria which had been surrendered by C. E. Greneaux to the Strahorn-Hutton-Evans Commission Company for an average period of seventy days from the date of the act, on the same terms and conditions and for the same price as agreed upon with C. E. Greneaux, except that the Strahorn-Hutton-Evans Commission Company, which had released C. E. Greneaux from his obligation to feed the said eighteen hundred head of beef cattle any further, had agreed also to pay to the Red River Oil Company the sum of three thousand nine hundred and twenty-six 66-100 dollars, then due it by Greneaux, as a part consideration of the sum mentioned as the price it was to pay for the transfer of the pledge drawn and the promissory note recited, would pay cash for all future feed furnished it from the Red River Oil Company, Limited.

In the act of sale from Greneaux to the plaintiff company of the cattle at Alexandria, and in the act evidencing the payment of the three thousand nine hundred and twenty-six dollars, the transfer of Greneaux' promissory note and the pledge securing the same as reduced, and the agreement of the Oil Company with the plaintiff company as to feeding the cattle which had then been transferred, the plaintiff company was represented by William Hunter, one of its stockholders, as its attorney in fact.

After the sale to it of the cattle, the plaintiff took active charge and control of the same through its agents and employees. The only connection of the defendant with them was the furnishing of the feed with which they were provided. While the cattle were in the ownership of the plaintiff a number of them died, and some were abandoned while being shipped to market on account of their physical condition. The plaintiff disposed of the balance and then brought the present action for damages alleged to have been sustained by it from the character of the feed furnished by the defendant company.

The plaintiff's claim of being transferee from Greneaux to his feed contract with the defendant company, with subrogation to all of his rights of action growing out of that contract rests, upon a writing without a date, signed by C. E. Greneaux alone, and written just below the

act evidencing the sale of the Alexandria cattle to the plaintiff and which reads as follows:

"It being the intent to include a certain feed contract of C. E. Greneaux with Red River Oil Company, Limited, under date of June 9, 1898, in the foregoing act of sale and as mention of same was inadvertently left out when, in fact, it was transferred to Strahorn-Hutton-Evans Commission Company in the same transaction and at the same date, I herewith expressly transfer said feed contract to Strahorn-Hutton-Evans Commission Company for the consideration above expressed, with full and complete subrogation to them of all my rights, privileges, titles, interest and rights of action of whatever nature or character."

The evidence shows that this paper was signed only a short time before the present action was brought.

The defendants deny that the feeding contract between Greneaux and itself was continued through the plaintiff company, and that the latter was subrogated to the rights of Greneaux under that contiact. They contend that the first contract between themselves and Greneaux was abrogated and ended with both parties being mutually and reciprocally released from it at the time that the second contract (that which was made between the plaintiff and themselves) was entered into. That the first contract was not continued, but merely referred to, and that for the single purpose of fixing the price to be paid by the plaintiffs for food which was to be the same as had been fixed in the first contract, and should be regulated by the same sliding scale. That the second contract was a new one, and after it had been entered into the rights and obligations of parties had to be tested by it.

The conclusions which we have reached in the case make a discussion of this question unnecessary, for we think the verdict of the jury and the judgment of the court were correct, from whatever standpoint matters may be viewed. The defendants' position on this subject is, however, correct, that the first contract was terminated and not continued through the plaintiff company under a transfer of it by Greneaux.

The first error of the plaintiff is in assuming and declaring that the defendant had, under its written contract with Greneaux, obligated itself to furnish cotton seed meal of prime quality and first-class as to quality. The quality of the seed and hulls to be furnished is not mentioned at all, and the price to be ultimately paid was on a fixed sliding scale on the basis of the average price of the seed furnished to the mill during the season. Under such circumstances defendant's obligation

was governed by the provisions of Article 2156 of the Civil Code, which declares that if the debt be of a thing which is determined only by its species, the debtor, in order to gain his discharge, is not bound to deliver it of the best kind, but he cannot tender it of the worst.

(This same principle finds expression in Article 1640 of the Code).

We are satisfied from the evidence that defendant furnished as good articles of meal and hulls as it was required to do by its agreement. It is true that on several occasions complaint was made of the quality of some of the seed or the hulls, but the complaint never rose to the seriousness of putting the defendant in default by reason of the same, nor would the occasions referred to have justified such a putting in default. The trouble on these occasions, if such it could be called, was occasioned not by the acts of the defendants, but by those of plaintiffs' employees in their taking of themselves from the storehouses to which they were given free access, the seed and hulls (of which there were several qualities) those which were most convenient to them at the time. Defendant's employees did not deliver them, but permitted plaintiffs' workmen to take them at liberty. The moment that objections were made on these occasions, the matter complained of was rectified. The fact that on all occasions other than these the feed was received and used without objection, is evidence that there was no cause for dissatisfaction. Not only were the meal and hulls received and used, but payment for the same was regularly made without complaint, up to the time that the last cattle were shipped. Even then plaintiffs' agent, on the spot, drew a draft of seven hundred and ninety-two 31-100 dollars representing the last instalment of the price of seed, and though the draft was returned dishonored, payment was not refused on account of any claimed defect in the quality of the feed, nor by reason of any assertion of claim for damages against the defendant.

At the time that Greneaux sold the cattle to the plaintiff company, he owed the defendant over thirty-nine hundred dollars for feed which the plaintiffs, his vendees, paid at his instance, and by consent of all parties, the note and pledge securing payment of that sum was transferred with subrogation, and the balance of the note of twelve thousand dollars, less fifteen hundred dollars, which represented the amount of Greneaux' whole ultimate liability to the defendant, under his contract, was cancelled.

Each and every payment made for the feed was at once an admission and a partial settlement. (See Giecke vs. Finlay & Brunswig, 45 Ann. 408). Over and beyond this Hunter, one of the plaintiff's stockholders,

who acted for the plaintiffs in the matter, saw the condition of the cattle at the time of the sale to his company and the quality of the feed being furnished, and while declaring that the latter was not of the best said, "before and at the time of making the new contract with the defendant, that he thought it would do." It was a difficult matter in 1898, by reason of the character of the weather, for the mills at that time to obtain the very best quality of seed. The feed furnished by the defendant was not of the best quality, but it was fair. The allegation in the plaintiff's petition that the defendants obligated themselves to furnish cotton seed meal and hulls first-class as to quality, in order to fatten the cattle for the markets of St. Louis or Kansas City, to which the cattle, when fattened, were shipped, is not borne out either by the contract or the evidence. Defendants unquestionably knew that the articles were intended for the feeding of the cattle, but they certainly did not undertake to fatten them, or to insure that the feed furnished would have that effect; they had not seen them, did not know what character of cattle they were; what their condition would be on arrival; how they would be handled; what amount of food they would be given, nor at what time it would be given; they, doubtless, knew that they were to be resold, but not when, nor at what markets; nor did they know at what extent of fattening Greneaux was aiming. It is not pretended that the defendants were experts in cattle feeding or had any knowledge as to what particular quality of meal or hulls would bring about certain results. If such a quality there was, plaintiffs should have specially contracted for it. It would have been folly for the defendants to have assumed any such obligations as the plaintiffs charge them with having taken upon themselves, and it is utterly unreasonable to suppose that plaintiffs, in making the contract, contemplated that such obligations were in fact assumed as the result of a simple sale to them of feed.

Assuming as true that defendants would be liable to the plaintiffs, on the basis contended for by them, for the failure of the food which they furnished to fatten the cattle,. or to fatten them up to the point that plaintiffs expected them to be fattened, we do not see how plaintiffs could expect a claim for damages to be fixed. If cattle did not fatten, or if they did not fatten to the point expected, it would be impossible to ascertain to what extent this was due to the feed furnished by the defendants even if it should be granted that they had contributed to those results. They could be attributed to numerous other contributing causes as shown by the evidence. Defendants charge that the cattle

were purchased at too high a price; that they were inferior in character; that they were taken by rail, after a long journey, to new places, away from their habitual surroundings, and subjected to the disquieting effects of noises and scenes to which they were not accustomed, which caused them to stampede and injure themselves; that food was placed before them of which they had no knowledge and which, for a time, they would not touch. That all cattle do not fatten alike, under precisely similar conditions; that these particular cattle were crowded together in too small a space on unsuitable ground, without a shelter in an exceptionally severe season both as to rain and cold; that they were forced to stand on their feet, unable to lie down and sleep, by reason of the depth of the mud in their pens; that coming to a new climate they had to pass through a process of acclimation; that a disease known as "staggers" was prevailing at the time all over Louisiana, attributable to no particular cause; that the handling and feeding of cattle over which defendants had no control was injudicious.

These various charges were unquestionably supported by evidence, disputed it is true, but none the less produced from reputable witnesses. We are not prepared to say to what precise extent these alleged charges were shown to be well founded, but we are satisfied that each and every one was more or less sustained. This being the case, we do not see how the plaintiffs could expect to throw either the whole burden of the loss of the venture or any special portion of it upon the defendants, assuming that they had contributed to it and that they would have been legally liable for a share of it had such share been fixed. We do not see how the jury could have reached any other conclusion than that evidenced by their verdict rejecting plaintiffs' demand.

Defendant has prayed for damages for a frivolous appeal.

These cannot be allowed. Appellant, as a plaintiff, lost his suit in the lower court. We do not think, under such circumstances, damages should be allowed even though the appellate court may think the appeal entirely without merit.

We are of opinion that the verdict of the jury and the judgment thereon, are correct.

The judgment appealed from is hereby affirmed.

Rehearing refused.