No. 6297.

# MARINE OIL COMPANY vs. JAC. TRAUTMAN & CO.

## Syllabus.

To recover one must make his claim certain; to make it only probable is not enough.

Appeal from the Civil District Court for the Parish of Orleans, Division "B," No. 94,977. Honorable F. D. King, Judge.

W. McL. Fassoux, for plaintiff and appellee.

Chas. Rosen, McCloskey & Benedict, for defendant and appellant.

His, Honor, CHARLES F. CLAIBORNE, rendered the opinion and decree of the Court, as follows:

This is a damage suit for the recovery of $633.75 value of two mules alleged to have been killed by the fault of the defendants.

Plaintiff alleges that in its business it uses a number of mules for the delivery of oil; that on August 2nd, 1910, it sent the defendants the following order, viz:

"Please deliver to our warehouse:

"One sack bran,

"Two sacks corn,

"15 ¼ bales hay,

"20 sacks oats,

"Must be clean stuff,"

that the defendants filled the order; that the plaintiff fed its seven mules with said oats on August 6th, and on the evening of August 7th one of said mules took sick and died; and that on August 8th, 1910, another mule took sick and died after being fed with the oats delivered by

— 204 —

the defendants; that petitioner had a post-mortem examination held upon the mule which died last, and said examination revealed that the mule had died of peritonitis caused by a mixture of barley with oats; that thereafter petitioner caused said oats to be examined, and said examination disclosed that there was only 73 80/100ths of oats in the oats delivered by defendants to petitioner, and that the balance 26 20/100ths was composed of foreign matter which was dangerous and injurious and not clean nor such as petitioner had ordered; that defendant's oats thus fed to said two mules were the cause of their death; that the mules were worth $300 each and that petitioner paid $33.75 for the services of a veterinary.

Defendants admit the sale of the oats to plaintiff, but deny that they were injurious or that they caused the death of the mules. They aver that they purchased the oats on the same day from B. F. Glover & Son, commission merchants in this city, as sound and merchantable oats, and delivered them in the same condition in which they had received them. They pray for judgment in their favor, and, if condemned for judgment in warranty against Glover & Son.

Glover & Son denied that the death of the mules was brought about by the causes alleged; they admitted that about August 2nd they sold Trautman & Co. oats known to the trade as No. 3 mixed oats, which were sound and merchantable; that they do not know what oats were sold by Trautman to the plaintiff company, nor what change, if any, took place in the quality of said oats after the sale to Trautman & Co.; they sold other oats of the same lot to many other consumers of this city about the same date and that they received no complaints of any kind;

that no act of theirs contributed to the death of said mules and that they are not liable.

There was judgment in favor of the plaintiff and against the defendants as prayed for, and the defendants have appealed.

The testimony is as follows:

James M. Hudson, aged 17 in 1910, superintendent of plaintiff's stables, took a sample of the feed out of the troughs and out of the bin and sent it to the office or to Dr. White; there was no old feed in the bins because they had been cleaned out that morning; they had trouble with it before because the rats had been there, and there were a couple of shovelfuls of the old stuff in the bins and it was cleaned up when the animals came in from work; they had seven mules; they were all fed on the same food; they did not clean the box entirely but they all ate; no other mule was sick; the oats were received in the morning and they were fed to the mules that night; in the same night one mule died and I think another died the next night; a negro, Bill Barnes, fed the mules; he is dead; the old stuff had been in the bottom of the bin six months; we bought oats every month and put them in this bin without cleaning it out; we cleaned it out every three or four months; Dr White was called in the same morning, and he came right away; both mules had been out all day hauling oil; the mules leave at six in the morning and return at five in the evening; they are fed at 5:30 in the morning and again at 6:30 in the evening; the mules had the run of the stables and a rolling pen at night where they had hay to eat; he did not feed the mules himself, nor was he present when they were fed; after the death of the mules the oats were put aside and not fed to the mules.

H. L. Watson is bookkeeper and cashier of plaintiff company; he ordered the oats complained of; he orders the oats every month; he gets quotations from two or three firms and then places the order at the lowest price; he first gave the order by phone and then confirmed it by the written order in evidence; he had had a complaint from their warehouse that their oats were dirty and he was anxious to get a good grade of feed; that was the substance of his message to Trautman & Co., and that is why he wrote '' it must be clean oats;'' a certificate of weight was attached to the invoice from the Glover Commission Co., and that certificate stated that the oats were number 3; I generally ordered white oats from Schrieber & Glover and from Trautman & Co., but I would not hazard the statement that I did in this case.

Dr. E. A. White is a veterinary surgeon; he treated both animals that died; he was called at 11 o'clock at night and took one mule to his place; the other was also sick; the first mule died at his place; and he made an autopsy; the cause of its death was acute peritonitis, primarily attributable to undigested barley in the oats; peritonitis is the result of colic; the symptoms were the same in both animals; I opened the stomach and found the undigested barley in the stomach; more than five per cent of barley may cause colic; at that time there was an enormous amount of death among animals due to oats; oats were high, and they were putting a large amount of barley in oats, and I would not permit the city to buy oats unless it was specified that they were free of barley; I examined the oats and they showed evidence of barley, and because the stomach also contained barley I came to the conclusion that the animal died from barley; I would not consider it proper treatment to begin working an animal at six o'clock in the morning, and getting nothing

to eat until six in the evening; that could cause colic; some animals fed on the very best of food die of colic.

W. O. Hudson, president of plaintiff company, gave instructions to H. L. Watson to get quotations on white oats; samples of the food which had been given to the animals were taken under my instructions and I took them up to Mr. Richey, Inspector of the Board of Trade, and asked him to make an analysis which he did; on the day after the first mule died I saw Mr. Piquet of the firm of Trautman & Co. and narrated to him the circumstances of the death of the two mules and told him there was barley in the oats; Piquet took back eighteen of the sacks of oats and delivered six sacks of white oats; witness then wrote Trautman claiming $600 as the value of the two mules by letter dated September 3rd, 1910. Trautman, in a letter dated September 6th, denied liability and said that in an experience of 30 years no such claim had ever been urged; that they had supplied other stables from the same oats and had no complaints; we paid Dr. White $35.75 for his services; each one of the mules that died cost me $300.

Edgar C. Richey, aged 32, is professor of agriculture in Ohio Northern University, and Assistant Grain Standardizer, U. S. Department of Agriculture; he made a report upon certain oats furnished by the Marine Oil Company; the report reads:

Sound oats, all kinds .................73.80%
Barley, ........... .................. 4.80%
Other grains, mostly wheat ........... 6.20%
Seeds, dirt. and foreign matter ........15.20%

The defendant introduced the following witnesses:

W. L. Richardson, Chief Grain Inspector for the Board of Trade for the last ten years; according to the estab-

lished rules governing the grading of grain at this port, No. 3 oats is the commercial grade of oats for feeding purposes; bids are made on the basis of No. 3; 95% of the oats dealt in on the New Orleans market are used to feed live stock; we would overlook from three to five per cent of barley in No. 3 oats; the oats under the report of Mr. Richey would class under our grade as oats and another grade.

John Everett is a boss drayman; buys No. 3 grade of oats; has had no trouble with his animals on account of using this grade; there is a good deal of barley in it; bought oats from Trautman in August, 1910, and none of his mules got sick; there was no dirt in the oats that I knew of or I would not have used them.

Lester Seidenbach is in the scrap iron business; bought oats from Trautman in August, 1910; none of my mules sickened.

Samuel D. Merwin owns wagons; bought oats from Trautman in August, 1910, had no trouble from them, always uses the same grade, when I cannot get it, I feed on white oats.

L. Monroe, stableman for Stern's foundry; bought oats from Trautman in August, 1910; none of the mules got sick; they were No. 3 oats; uses that grade for stock ordinarily; never had any trouble with it.

Harry Piquet, is manager of the oats department of Jac. Trautman & Co. The Marine Oil Co. telephoned for the lowest price on oats, he gave them a price on merchantable standard oats, which is No. 3 mixed oats, and they told him to book the order and later on sent a written order; they delivered 20 bags directly from the Glover Commission Company warehouse; after Mr. Hudson informed him that he had lost two mules, he took back the 18 remaining sacks; on the same evening he delivered two

lots out of said 18 sacks, on the 9th he shipped same to Louisiana, and on the 10th he gave the last two bags to a customer in New Orleans; Mr. Everett, Mr. Seibenbach and Mr. Merwin got some of the oats; we never got a complaint from any one; these oats are No. 3 standard grade, upon which 95 per cent of stock is fed; 80% of our business is in this grade of oats; this is the first time in thirty years that we have had a complaint of this kind.

R. J. Cotton, clerk for Trautman, got an order from the Marine Oil Company over the telephone for the lowest price on 20 sacks oats; I think it was Mr. Watson; the next morning we got a written order confirming the telephone order to send it down to the warehouse; we got the 20 sacks from Glover on an order for 35 sacks; no grade of oats was mentioned in the order, and white oats were not mentioned, nor was anything said about being free from barley; we had sold the Marine Oil Co. similar oats in April, May and June and previous months, No. 3, regular grade; the 18 sacks returned to us we sold to Sam Merwin, the Southern Scrap Material, Sterns Foundry, Morice and others, and we never had any complaint from any one else. The No. 3 was put on the invoice by a clerk of Glover & Co.

Fred P. Futvoye was general manager for Glover & Sons on August 2nd, 1910, and is not now in their employ; the No. 3 was not on the certificate at the time it was made out; we mix our own oats; the oats we sold to Trautman were mixed by us; the mixture is composed of No. 3 oats and 3 white and No. 2 white; we mix no barley except what comes naturally in the oats, we had no barley of our own; our diamond mixed oats is what they call No. 2 oats, high grade for race horses and things like that; we mixed a bin of 3000 bushels, and we sold the contents of

that bin to Trautman, Coyle & Co., Aaron Levy, Bernheim, Central Lumber Co., Pool & Son, H. T. Cottam, Nick Frey, Davis & Sharp at Jeanerette 225 sacks, and we received no complaints from any one; we put no wheat in our oats nor seed dirt, we do not handle them; the sacks we sold to Trautman contained no barley; we didn't have any wheat in the house, we never handled it; as a general rule, No. 3 oats contained a general amount of barley; 4.81 per cent of barley alone is not a slight per centage; the proportion shown in the examination of Dr. Richey would not class as No. 3 oats.

Dr. H. W. Laughlin, a veterinary surgeon of ten years practice; does not think that a percentage of 4.81 per cent of barley in oats fed to mules would be detrimental at all; it would not be sufficient to cause colic or peritonitis; the most prominent cause of colic in mules comes from the way they are fed and cared for; working them all day with no meal at noon causes them to gorge themselves in the evening with food and drink which produces fermentation and colic.

Dr. John A. Kyle, a verterinary surgeon, of 24 years practice; we have had no bad effects from feeding mules with a percentage of barley; we have fed as high as ten per cent without trouble; we recommend feeding stock three times a day; when animals come in they are warm and hungry and will eat too much, ravenously, and then drink a lot of water, causing fermentation in the stomach and colic; No. 2 white oats is more usually fed than any other; No. 3 is fed also; No. 2 white sells for the highest price, it is a much finer oat than No. 3 mixed; mixed oats is black oats mixed with white oats; they contain no other substances but more fibre and less kernel; wild seed occurs in the field with the oats; it is dangerous only in

excessive quantities; five per cent of barley is not an excessive quantity; oats composed according to the examination of Dr. Richey would be dangerous.

Conceding for the purposes of this case that the vendor of articles of food for consumption by man or beast warrants their quality and wholesomeness, and that in case of breach of this warranty he is liable to the purchaser for all such damages as were contemplated or might reasonably be supposed to have entered into the contemplation of the parties at the time of the contract.

**129 La., 836.**

Nevertheless, in order to succeed in this case plaintiff must establish three propositions:

1st. That the oats delivered to them by the defendants were of a quality inferior to that ordered by them.

2nd. That those oats were fed to their mules, and,

3rd. That the inferior quality of the oats was unknown to them and was injurious and the cause of the sickness and death of their mules.

We think they have failed to establish these propositions.

**I.**

The evidence is that the plaintiffs are in the habit every month of getting quotations on oats from two or three firms and then place the order at the lowest price; they did this in this case; they rang up the defendants by telephone, and when they learned their lowest price, they ordered the oats; they did not order any particular kind, quality, or grade, but only the one that commanded the lowest price; they could not expect to get the best grade

— 212 —

of oats for the lowest price, but only those oats corresponding in quality with the price they were paying. It was only the next day that they confirmed their telephone message with a written order upon which they wrote "20 sacks oats—must be clean stuff." The words "clean stuff" were ambiguous and applicable to all grades of oats, and at any rate came after the phone message had been given. That did not mean free from barley or wheat. If the plaintiffs had intended to convey that meaning, they should have said so and not left it to inference. C. C., 1956. They knew that they had not ordered the best grade of oats; they knew that white oats, of one or two grades, were of a superior quality; W. O. Hudson, president of the plaintiff company, instructed the cashier for white oats; they were of better quality, but, of course, cost more. We believe therefore that the plaintiffs received the kind of oats they ordered and which alone they could expect the defendant to send to them.

105 La., 738; 104 La., 664.

## II.

Nor is it established with reasonable certainty that these oats were fed to plaintiff's mules on the night that they took sick. The stableman, Bill Barnes, who fed the mules, was dead at the time of the trial. The inference is that these oats were fed to the mules because there were no other oats in the stables. But the bin in which plaintiffs kept their oats had been cleaned that morning; it had not been cleaned for four months, and the bottom contained the accumulated leavings of all that time; besides the rats had been eating the feed; it does not appear what became of the damaged feed that had been taken out of the bins; it might have been put in the

— 213 —

troughs as food for the mules; there is no evidence that it was thrown away, or it may have been mixed with the defendant's oats for that night's feed.

## III.

We are not satisfied that the oats furnished Dr. Richey for his examination was a fair sample of the oats sold by the defendants. The samples were taken from the bin and from the trough. It is clear that a sample from the trough would not do justice. As we said before, the contents of the trough might have been the refuse from the bin; and even if it was not, the troughs might have been unclean, as the bins were, and the mules had already been fed from these troughs. But even if the samples represented the quality of the contents of the sacks, we fail to be convinced that they were the cause of the death of the mules. The analysis of Dr. Richey discloses a per centage of barley in the oats of 4.80. Dr. White, who made the autopsy, says that this barley was the cause of the death of the mules. But Drs. Laughlin and Kyle testify that five per cent of barley in oats is not injurious. Their testimony is entitled to as much weight as that of Dr. White. They are corroborated in their statement by the evidence that 95 per cent of all the oats fed to animals in this city is No. 3, which contains 5 or 10 per cent of barley, and by the further fact that out of 3000 bushels of oats taken by defendants from one bin, this has been the only complaint. Nor can we understand how these oats could have been poison to two mules and harmless to five others who equally partook of them at plaintiff's stables. Neither plaintiff nor defendants apprehended or contemplated that harm would follow the eating of those oats. There are other circumstances, be-

sides, which made it possible that plaintiff's mules were affected by colic from other causes. There is no pretense that the other grains in the oats, mostly wheat, were injurious. Nor is there any evidence that the seeds, dirt and foreign matter produced death. Dr. White charged barley as the only cause of death. But the presence of the barley in oats was patent. The warranty of the vendor is concerning the hidden defects of the thing sold.

C. C., 2276 (2451); 2521 (2497).

Plaintiff had bought and used oats of that grade before, and knew what they were. Taken altogether the record does not show with sufficient legal certainty that the oats sold by defendants were the cause of the death of plaintiff's mules; at least there is an element of doubt in our minds too strong to permit us to condemn the defendants.

Castillion vs. Walsten, No. 5866, Court of Appeal. I H. D., p. 5, 24 No. 1.

It is therefore ordered, adjudged and decree that the judgment of the District Court be reversed, and that there now be judgment in favor of defendants, dismissing plaintiff's demand at their cost in both Courts.

Judgment reversed.

Opinion and decree, March 15th, 1915.

Rehearing refused, April 19th, 1915.

Writ denied, May 25th, 1915.